WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Julie D Friess,<br><br>    Plaintiff,<br><br>v.<br><br>Mortgage Law Firm PC, et al.,<br><br>    Defendants. | No. CV-24-08180-PCT-DWL<br><br>**ORDER** |

Pending before the Court is pro se Plaintiff Julie Friess's motion for a temporary restraining order ("TRO"). (Doc. 15.) The motion, filed on September 30, 2024, seeks to bar a trustee's sale of Plaintiff's home that is scheduled for October 3, 2024 at 11:00 a.m. (Doc. 15-1 ¶ 2.) The Court has now reviewed Plaintiff's motion papers and the other filings in the record and concludes that Plaintiff's motion may be resolved without a hearing and without requiring further briefing from Defendants. For the reasons that follow, Plaintiff's motion is denied.

**RELEVANT BACKGROUND**

I.   <u>The Sedona Property</u>

In 2003, Plaintiff obtained a $306,000 loan to buy a parcel of real estate located in Sedona, Arizona ("the Sedona Property"). (Doc. 8-1 at 3.)[1] The loan was secured by a deed of trust recorded with the Yavapai County Recorder's Office. (*Id.*)

In 2005, Plaintiff obtained a $359,650 loan to refinance the Sedona Property. (Doc.

---
[1]   All of the attachments to Doc. 8 are judicially noticeable.

8-2 at 3.) That loan was also secured by a deed of trust recorded with the Yavapai County Recorder's Office. (*Id.*)

Over the years, the deed of trust was assigned to various servicers. (Docs. 8-3, 8-4, 8-5, 8-6.)

On October 16, 2019, the loan servicer at the time, Shellpoint Mortgage Servicing d/b/a/ NewRez, LLC ("Shellpoint"), "referred the loan to an attorney . . . to commence foreclosure." (Doc. 8-7 at 18.)

II. The 2021 Lawsuit

On May 7, 2021, Plaintiff filed a lawsuit in the United States District Court for the District of Arizona that was captioned *Friess v. Shellpoint Mortgage Servicing*, 21-cv-08101-GMS. (Doc. 8-7.) Among other things, Plaintiff alleged in that action that Shellpoint was "the current beneficiary" and "the current servicer" of the loan secured by the 2005 deed of trust and that "due to Shellpoint not providing [certain requested records], [Plaintiff] has been unable to . . . properly assess the accuracy, or lack thereof, of Shellpoint's accounting regarding the amounts owed, including but not limited to, assessing the legitimacy of various actions taken by Shellpoint in connection with servicing the Loan." (*Id.* ¶¶ 7-9, 25.) Plaintiff added: "Due to being unable to bring her account current, [Plaintiff] is forced to continue living in fear that she may lose her property through foreclosure efforts . . . ." (*Id.* ¶ 28.) Based on those allegations, Plaintiff asserted claims against Shellpoint for violating various provisions of the Real Estate Settlement Procedures Act ("RESPA"). (*Id.* ¶¶ 31-34.)

On March 10, 2022, Chief Judge Snow dismissed Plaintiff's complaint for failure to state a claim, with leave to amend, and ordered that failure to file an amended complaint within 30 days would result in dismissal with prejudice without further notice. (Doc. 8-8 at 3-11.)

On April 13, 2022, after Plaintiff failed to timely file an amended complaint, the Clerk entered judgment in Shellpoint's favor and dismissed the case with prejudice. (*Id.* at 2.)

III. <u>The 2022 Notice Of Trustee's Sale</u>

On July 22, 2022, Shellpoint recorded a notice of trustee's sale with the Yavapai County Recorder's Office. (Doc. 8-9.) It announced that a trustee's sale of the Sedona Property was scheduled for October 31, 2022. (*Id.* at 2.)

III. <u>The 2022 Lawsuit</u>

On August 18, 2022, Plaintiff filed a lawsuit in Yavapai County Superior Court captioned *Friess v. Shellpoint Mortgage Servicing et al.*, Case No. V1300-CV-202280209. (Doc. 8-10.) It consisted of one lengthy paragraph and set forth a wide array of claims—including many of the same claims and theories that Plaintiff has reasserted in this case—but alleged few, if any, nonconclusory facts. (*Id.*)

Following Plaintiff's filing of the second lawsuit, the trustee's sale scheduled for October 21, 2022 did not go forward.

On February 21, 2023, the Yavapai County Superior Court dismissed Shellpoint (as well as several other defendants) from the second lawsuit for failure to serve. (Doc. 8-11.)

IV. <u>The 2024 Notice Of Trustee's Sale</u>

On July 1, 2024, Shellpoint recorded another notice of trustee's sale with the Yavapai County Recorder's Office. (Doc. 8-12.) It announced that a trustee's sale of the Sedona Property was scheduled for October 3, 2024. (*Id.* at 2.)

V. <u>This Lawsuit</u>

On August 12, 2024, Plaintiff filed a complaint in Yavapai County Superior Court. (Doc. 1-1 at 3-59.) The introductory paragraph of the complaint asks the court, "pursuant to Rule 65, Arizona Rules of Civil Procedure, to issue a court order to stop all foreclosure proceedings to [the Sedona Property] where she resides and to issue a temporary restraining order (TRO), preliminary injunction, permanent injunction, restitution, sanctions, and damages as it sees fit." (*Id.* at 3-4 ¶ 1.) The complaint goes on to question the legitimacy of the notice of trustee's sale because (a) "MERS does not have authority to assign this deed of trust"; (b) the name of the trustor was not written "in capital letters and . . . exactly as shown on the deed of trust"; (c) "American Brokers Conduit has been defunct since

2007," meaning "[t]his is a fraudulent/fake assignment and foreclosure"; and (d) certain assignments of the deed of trust were the product of "notary, and signature FRAUD" because two documents are signed by Cynthia M. Brock but the two signatures are different. (*Id.* at 4-6 ¶ 3(i)-(iv).) The complaint further alleges that the foreclosure proceedings began in 2019 at a time when Plaintiff "had approved a repayment plan with the borrower" and "was currently paying on her repayment plan following a forbearance from a trauma and severe illness for three months but [Shellpoint] refused to stop the foreclosure action." (*Id.* at 6-7 ¶ 3(iv)(d).) The complaint further alleges that after Plaintiff filed a TRO action in January 2020, Shellpoint's attorney "cancelled the foreclosure one week prior to the auction while laughing on the phone at [Plaintiff], and making fun of her" and another attorney told her that "'accidentally' foreclosing on anyone in the state of Arizona is not even a tort, so he 'really didn't care what happened.'" (*Id.*) The complaint then alleges that a January 8, 2024 assignment of Plaintiff's loan was "fake," in part because the notary public did not confirm "the truthfulness, accuracy, or validity of the document." (*Id.* at 7-8 ¶ 3(iv)(e)-(i).) The complaint then appears to identify various purported deficiencies with the assignment of deed of trust, which seem to focus on clerical details, for example, whether Plaintiff's name appeared in all capital letters and included the descriptor "An Unmarried Woman." (*Id.* at 9-11 ¶ 3(v)-(xiii).) An "Addendum" restates this list and alleges (in seemingly contradictory terms) that the Sedona Property "has already been paid off" and "was in active loss mitigation, in default, so it could not be sent to foreclosure and sold, that is not legal, it's called double-tracking." (*Id.* at 50-54.)

Based on these allegations, the complaint appears to assert, with less-than-ideal clarity, at least the following claims: (1) "Conspiracy against rights—18 U.S Code § 241" (*id.* at 19 ¶ 37), which Plaintiff later clarifies is directed toward Judge Linda Wallace of the Yavapai County Superior Court (*id.* at 33 ¶ 91); (2) "Debt Collection Validity" pursuant to 15 U.S.C. § 1692g(b) (*id.* at 19 ¶ 45, 22 ¶ 49); (3) "Disputed Debts," under which "a debt collector must cease collection of the debt until it is validated" (*id.* at 19 ¶ 46); (4) "Defective Chain of Title and also No Standing or Authority to Foreclose" (*id.* at 23 ¶ 49);

(5) "Uniform Commercial Code (UCC), Section 3099 of Article 3 (UCC 3:309)," under which "'[s]how me the note' is only one part of the equation" (*id.* at 27 ¶¶ 72-73); (6) "Standing Capacity" (*id.* at 29 ¶ 81); (7) "Chain of Title is Defective due to mortgage fraud, deed fraud, forgery, signature, notary fraud, fake assignments" (*id.* at 30 ¶ 87); (8) "False ownership interest" (*id.* at 30 ¶ 90); (9) "Tort of injurious falsehood" (*id.* at 30 ¶ 91); (10) "Tort of slander" (*id.* at 30 ¶ 92); (11) "Falsity, malice, special damages" (*id.* at 30 ¶ 93); (12) "Systematic abuse and no standing" (*id.* at 30 ¶ 94); (13) "negligently misrepresenting . . . and committing outright fraud" (*id.* at 31 ¶ 110); (14) "harassment and abuse" (*id.* at 31 ¶ 111); (15) "predatory behavior [and] charging of junk fines and fees without performing any services for them (RESPA violations)" (*id.*); (16) "deceptive lending practices" (*id.*); (17) violating "ARS § 33-420" by filing "false or fraudulent documents . . . with a county recorder" (*id.* at 39 ¶ 117); (18) "SLANDER OF TITLE" (*id.*); (19) "QUIET TITLE" (*id.* at 39 ¶ 118); (19) "a common law remedy grounded on equity to determine ownership of real property" (*id.* at 39 ¶ 119); (20) "The defendants have committed tax evasion, IRS fraud, accounting fraud, not abiding by GAAP accounting practices, and have no standing to foreclose" (*id.* at 40 ¶ 126); (21) slander, defamation, and humiliation by "publicly announcing each fraudulent foreclosure" (*id.* at 41 ¶ 129); (22) "Defamation of real estate" (*id.* at 43 ¶ 135); and (23) a "42 USC 1983 civil rights claim" intended to establish that Arizona's "normal everyday foreclosure process is in violation of the State constitution, as the foreclosure statute is not a valid law" (*id.* at 44). Some of the damages sought by Plaintiff include $750 million in punitive damages and the "judge's property and personal assets." (*Id.* at 47 ¶ 138.) The complaint also asks that the "court award [Plaintiff] control of the court's corporate charter and order[] the court to add [Plaintiff] to its Board of Directors." (*Id.* at 48.)

Plaintiff also enclosed, as an attachment to the complaint, an affidavit. (*Id.* at 58-59.) In the affidavit, Plaintiff asserts that she "is not a U.S. citizen subject to an administrative court's jurisdiction without an injured party or damaged property"—which appears to be some sort of sovereign citizen-style argument—and appears to preemptively

impugn the impartiality of the entire Arizona state judiciary: "The case mentioned above must be transferred in the interest of justice. Other state court judges are participating in the same misconduct, so the defendant cannot get a fair and impartial trial in the state court." (*Id.*)

On September 9, 2024, Plaintiff filed a purported "Amendment to Original COMPLAINT (in addition to and including original complaint)." (*Id.* at 169-86.) Plaintiff again announced an intention to seek a TRO, preliminary injunction, and permanent injunction. (*Id.* at 169.) One of the new legal theories articulated in this document is a claim "[p]ursuant to 12 U.S.C. 5552(a)(1) of the Consumer Financial Protection Act of 2010 and enforcement of 12 U.S.C. 5531 and 5536(a)." (*Id.* at 172 ¶ 1A(ii).) Another new legal theory is that "[t]he only party which can do a foreclosure (if they actually have the authority to do so) is the IRS commissioner." (*Id.* at 173 ¶ 1A(v).)

On September 18, 2024, Shellpoint timely removed this action to federal court based on the federal-question jurisdiction arising from Plaintiff's assertion of various federal statutory claims. (Doc. 1.)

On September 25, 2024, Shellpoint filed a motion to dismiss. (Doc. 8.) In a nutshell, Shellpoint argues that "[Plaintiff's] amended complaint pleads no ascertainable cause of action and was apparently filed for the sole purpose of stalling the impending foreclosure. To the extent any argument can be extrapolated from [Plaintiff's] amended complaint, it fails to state a claim and fail as a matter of law." (*Id.* at 4.)[2]

On September 30, 2024, Plaintiff filed the pending TRO motion, which contains no argument and simply gives notice of Plaintiff's request for a TRO and asks that a hearing be set for October 2, 2024. (Doc. 15.) Plaintiff also provided an affidavit as an attachment to her TRO motion. (Doc. 15-1.) It contains the following avowals:

- "I have meritorious claims and defenses tom [sic] their actions and if allowed to go forward without due process, I will suffer immediate and irreparable

---

[2]   Another defendant, Bank of America, N.A., has filed a separate motion to dismiss for failure to state a claim and for failure to effect service. (Doc. 7.)

harm inasmuch as my residence for the last 21 years will be sold out from under me in the equivalent of a 'fire sale' with no possibility to retrieve it after the sale." (*Id.* ¶ 2.)

- "Defendants . . . have undertaken courses of action both collectively and individually to repossess or foreclose on my home when they have no authority, when they have no legal basis, and they have no standing documentation to do so inasmuch as they do not own the loan or the Note." (*Id.* ¶ 3.)

- "I have alleged the nature and the extent of the 'improper' actions undertaken by the banks, the mortgage companies and their respective attorneys, many of whom have purported deeds which are either fraudulent in their executions which were forged or in the manner in which any purported deeds were obtained by and through Bank of America, N.A. who transferred the deeds through 'shell companies' which had no legal authority to handle or sell those deeds, especially where they did not have the note." (*Id.* ¶ 4.)

On October 1, 2024, this action was reassigned to the undersigned judge. (Doc. 16.)

## ANALYSIS

I.  Legal Standard

Under Rule 65 of the Federal Rules of Civil Procedure, a party may seek injunctive relief if it believes it will suffer irreparable harm during the pendency of an action. There are two types of injunctions available under Rule 65: TROs and preliminary injunctions. Both are governed by the same substantive standards. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

On the merits, a TRO or "[a] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (cleaned up). *See also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citation omitted). "A

plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  "But if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (cleaned up).  Under this "serious questions" variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another."  *Lopez*, 680 F.3d at 1072.  Regardless of which standard applies, the movant "carries the burden of proof on each element of either test." *Env't. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

II.     Discussion

Beginning with the first *Winter* factor, Plaintiff has not met her burden of establishing a likelihood of success on the merits or even serious questions going to the merits.  As initial—and dispositive—problem is that Plaintiff's complaint is confusing and poorly organized and filled with conclusory assertions of fact and unexplained references to statutes and legal theories that are often facially invalid or otherwise inapplicable to the current situation.  For example, although Plaintiff apparently seeks to bring criminal charges under 18 U.S.C § 241 against a state-court judge (Doc. 1-1 at 19 ¶ 37, 33 ¶ 91), "Title 18 governs federal crimes and, with limited exceptions not implicated by the pleadings, does not provide a private right of action for civil litigants." *Chabrowski on behalf of ARTBE Enterprises, LLC v. Litwin*, 2017 WL 2841212, *2 (D. Ariz. 2017). Plaintiff apparently also seeks to challenge Defendants' foreclosure authority pursuant to a "show me the note" theory (Doc. 1-1 at 27 ¶ 73), but "this district has firmly rejected such 'show me the note' claims." *Pondexter v. Murrieta*, 2021 WL 199239, *2 (D. Ariz. 2021).  Plaintiff also seeks to reassert RESPA claims against Shellpoint and the other

defendants (Doc. 1-1 at 31 ¶ 111), but Plaintiff ignores that her previous RESPA lawsuit against Shellpoint was dismissed with prejudice. Nor does Plaintiff make any attempt to reconcile her allegation that she paid off her home loan in April 2012 (*id.* at 15 ¶ 23) with her seeming contrary statements in her two earlier foreclose-avoidance lawsuits. (Doc. 8-7 ¶ 28 [Plaintiff's acknowledgement, in her 2021 lawsuit, that she was "living in fear that she may lose her property through foreclosure efforts" due to "being unable to bring her account current"]; Doc. 8-10 at 2 [Plaintiff's assertion, in her 2022 lawsuit, that the defendants "implement[ed] procedures that encourage Plaintiff to get deeper into loan delinquency"].)

Next, even assuming that Plaintiff's purported amended complaint is a valid pleading that incorporates all of the allegations in the original complaint and adds further allegations, it only compounds these deficiencies. For example, Plaintiff's contention in the amended complaint that "[t]he only party which can do a foreclosure (if they actually have the authority to do so) is the IRS commissioner" (Doc. 1-1 at 173 ¶ 1A(v)) is simply untrue. Also unavailing is Plaintiff's reliance on 12 U.S.C. § 5552(a)(1) (Doc. 1-1 at 172 ¶ 1A(ii)), because that statute vests authority in "the attorney general (or the equivalent thereof) of any State" to bring certain types of civil actions.

Despite these problems, it might have been possible for Plaintiff to establish a likelihood of success on the merits, or at least serious questions going to the merits, if she had used her TRO motion to identify her strongest claims, to identify the elements of those claims, and to explain why she is will likely be able to satisfy those elements. However, Plaintiff has utterly failed to make such a showing here. The TRO motion is devoid of any reasoned argument. Additionally, although Plaintiff's attached affidavit adequately explains why Plaintiff will suffer irreparable harm if the trustee's sale of the Sedona Property goes forward (Doc. 15-1 ¶ 2), the remaining portions of the affidavit merely contain conclusory assertions about the merits of Plaintiff's claims, such as "I have meritorious claims and defenses" (*id.* ¶ 2); "Defendants . . . have no authority, . . . no legal basis, and . . . no standing documentation to do so inasmuch as they do not own the loan or

the Note" (*id.* ¶ 3); and "many of [Defendants] have purported deeds which are either fraudulent in their executions which were forged or in the manner in which any purported deeds were obtained . . . especially where they did not have the note" (*id.* ¶ 4.) Nor does Plaintiff make any effort to explain why some of the purported deficiencies identified in her complaint, such as that the name of the Trustor was not written "in capital letters" in the notice of trustee's sale (Doc. 1-1 at 5 ¶ 3(iv)(b)), have any bearing on the validity of Defendants' foreclosure efforts.

Given this backdrop, it cannot be said that Plaintiff has, "by a clear showing, carried the burden of persuasion" as to the first *Winter* factor. *Lopez*, 680 F.3d at 1072. Perhaps it is possible to cobble together some combination of the factual assertions scattered throughout the complaint in a manner that creates a likelihood of success on the merits of some unspecified cause of action, but "[j]udges are not like pigs, hunting for truffles buried in briefs," *Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 488 (9th Cir. 2010) (cleaned up), or, in this case, buried in pleadings. It was Plaintiff's burden, as the party seeking the extraordinary remedy of a TRO, to make the necessary showing as to the first *Winter* factor and she failed to do so here.

The third and fourth *Winter* factors also cut against Plaintiff's request. This appears to be the third time Plaintiff has attempted to stave off foreclosure by initiating litigation on the eve of a trustee's sale. Although the previous two lawsuits were successful in achieving that objective, Plaintiff did not prevail (or even raise a colorable claim) in either case—the first was dismissed for failure to state a claim and the second was dismissed as to Shellpoint and others for failure to serve. Additionally, Plaintiff has attempted to raise an array of outlandish claims and theories thus far in this case, including a federal criminal charge against a state-court judge, a request for $750 million in punitive damages as well as the "judge's property and personal assets," a missive questioning the impartiality of the entire Arizona state judiciary, and a request to be appointed to the Yavapai County Superior Court's board of directors. Such requests are indicative of bad faith, which tips the balance of equities against Plaintiff. Nor is there a public interest in allowing such tactics to

succeed.³

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for a TRO (Doc. 15) is **denied**.

Dated this 2nd day of October, 2024.

Dominic W. Lanza
United States District Judge

---

³ The late timing of Plaintiff's TRO motion provides another reason why it should be denied. The October 3, 2024 trustee's sale was noticed on July 1, 2024 (Doc. 8-12) but Plaintiff waited until September 30, 2024 to file the pending motion for a TRO. Perhaps Plaintiff believed that the references in her complaint and purported amended complaint concerning her intention to seek a TRO were sufficient, but "[a] request for a court order," such as a request for a TRO, "must be made by motion." Fed. R. Civ. P. 7(b)(1). Thus, "the proper method to request a TRO or a preliminary injunction is by separate motion." *In re River Valley Fitness One, LP*, 297 B.R. 354, 355 (Bankr. D.N.H. 2003). *See also Benner v. Alves*, 2022 WL 220314, *2 n.2 (D. Mass. 2022) ("In the complaint documents, Benner references seeking a TRO . . . . To the extent that Benner seeks preliminary injunctive relief or a temporary restraining order in this action pursuant to Federal Rule Civil Procedure 65(a), he must file a separate and properly supported motion.") (cleaned up); *Carter v. Muldoon*, 2017 WL 4351442, *1 (D. Neb. 2017) ("Plaintiff's request for a temporary restraining order contained in his Complaint will be denied."); *Holt v. Howard*, 2012 WL 6087168, *1 (E.D. Ark. 2012) ("Holt's request for temporary injunctive relief, which is embedded in his complaint, is not properly before the Court. . . . [T]he Court will not address a TRO or a preliminary injunction unless and until Holt moves for one with supporting papers."); *Hanson v. Aurora Loan Services LLC*, 2010 WL 11647436, *2 (N.D. Ga. 2010) ("[Plaintiff] has not filed a separate motion for a TRO but has instead merely requested a TRO in the Complaint. This is insufficient to comply with the requirements of Rule 65."). As this Court concluded when denying a foreclosure-related TRO request in a similar case, "delay[ing] for many weeks before seeking an emergency TRO . . . is not the proper way to present a claim for emergency relief based on an alleged threat of imminent, irreparable injury." *Emiabata v. Bank of N.Y. Mellon Tr. Co.*, 2024 WL 1299416, *3 (D. Ariz. 2024).

- 11 -